George N. Caravasios, Wheeling, W. Va., for petitioner.

George H. Mitchell, Asst. Atty. Gen., for respondent.

PAUL, Chief Judge.

At the pre-trial conference held herein March 23, 1964, the issues were defined as set forth in the following excerpt from the Pre-trial Conference Order:

> "It was agreed that the following are the issues of ultimate fact to be presented and submitted at the hearing:
>
> "(1) Was the testimony of Billy Gene Cobb, introduced at the trial in the Circuit Court of Upshur County, West Virginia, perjured?
>
> "(2) Did the prosecuting officials know that Cobb's testimony was false at any time before verdict and judgment?
>
> "If there are any issues of law to be raised regarding the necessity and burden of the petitioner to prove knowledge on the part of the prosecuting officials of the falsity of the testimony, those issues shall be stated and briefed in trial briefs served and filed not later than April 3, 1964."

**Jimmy ROLLINS, Petitioner,**

v.

**Otto C. BOLES, Warden of the West Virginia State Penitentiary, Respondent.**

**Civ. A. No. 1282–W.**

United States District Court
N. D. West Virginia,
at Wheeling.

April 9, 1964.

Upon the record, including the testimony and exhibits given and introduced at the hearing held April 6, 1964, the court finds, with respect to the ultimate issues of fact, as follows:

(1) The evidence is too inconclusive for this court to make a finding either that the witness Cobb's testimony at the trial was true or that it was perjured, and this court is unwilling to make a finding based only upon the burden of proof. Therefore, no finding is made on this aspect of the case.

(2) Neither the Prosecuting Attorney nor any of the arresting and investigating officials had knowledge or reason to believe that Cobb's testimony was perjured at the time it was offered and given or at any time prior to the time the judgment of conviction became final.

Subsidiary findings of fact are incorporated in the following narrative:

On January 17 or 18, 1962, a general store in the community of Rock Cave, West Virginia, was burglarized. Entry was gained through a second-story window by use of a ladder, and a number of cartons of cigarettes, a collection of old coins in coin wrappers, and some other general merchandise were stolen. The officer in charge of the investigation, Sgt. B. L. Burner, of the West Virginia Department of Public Safety, received information that Rollins and another had been trying to sell unbroken cartons of cigarettes in various neighboring communities on January 18th, and an order for the arrest of Rollins was broadcast over the State. Rollins was apprehended and arrested in Webster County, West Virginia, on January 19th. Cartons of cigarettes, later identified as being among those stolen, were found under the seat of his car, and torn coin wrappers, later identified as being those in which the stolen coins had been wrapped, as well as an O. P. A. token which had been among the collection, were found on the floor of his car. Some of the old coins were found in Rollins' pockets. Rollins was returned to the jail at Buckhannon, Upshur County, West Virginia.

Several days later Billy Gene Cobb was also arrested. Cobb voluntarily gave a written statement to the officers to the effect that, on the night of the robbery, Rollins had picked him up in Rollins' car, had driven to the Rock Cave store, and, while Cobb remained in the car, Rollins had broken into and entered the store and removed the stolen goods. Shortly thereafter, Cobb and another jail prisoner named Wyatt escaped from the jail and gathered up some of the stolen goods from various places where it had been cached. Upon Cobb's recapture, he gave another and more detailed written statement to the officers, again implicating Rollins as principal in the burglary. Rollins was indicted for breaking and entering and larceny, and Cobb was separately indicted for larceny and aiding and abetting breaking and entering. Counsel was appointed for Rollins and his jury trial took place April 25, 26, and 27, 1962, resulting in a verdict of guilty, judgment of conviction, and the sentence which Rollins is now serving. After Rollins' conviction, the charges against Cobb were nollied. Cobb was on parole at the time, and his parole was revoked and he was returned to prison to complete the sentence which he is now serving. Cobb testified at Rollins' trial in accordance with his written statements.

On May 14, 1962, when Rollins, Cobb and Wyatt were all in the penitentiary at Moundsville, Rollins, Wyatt and another prisoner named Davis got hold of Cobb. Rollins wrote out in pencil a statement which recited that Cobb repudiated the testimony he had given at Rollins' trial, saying that it was another "unknown companion", not Rollins, who had committed the robbery; that he had framed Rollins because he didn't think the officers would believe his story if he charged his actual companion, and that he had testified against Rollins because he had been compelled to do so by threats that, if he did not, he would be convicted and sentenced to life imprisonment as a third offender, and because of promises that if he did so testify, the charges against him would be dropped. Cobb signed the

statement and the other three signed as witnesses. No prison official was informed of the statement or called upon to administer an oath to Cobb with respect thereto.

At Rollins' trial the State introduced the evidence of Rollins' attempt to sell the cartons of cigarettes; his possession on his arrest of some of the loot, and Cobb's testimony. Rollins' defense was alibi, which he attempted to establish by his own testimony and that of several drinking and gambling cronies. The alibi was refuted by State's witnesses who saw Rollins' car and Rollins near the scene of the robbery on the night in question.

At the hearing Rollins testified that his reason for believing that investigating officers and the prosecuting attorney knew that Cobb's testimony was perjured was that he had been told by Wyatt that Cobb had so told Wyatt, and the fact that the charges against Cobb had been dropped. Cobb refused to testify on the material issues, claiming his Fifth Amendment privilege. The officers who were present and interrogated Cobb established that Cobb's statements were freely and voluntarily given, without any promises or threats. The Prosecuting Attorney established by his testimony that he had not interviewed Cobb prior to the trial, and that he had no reason to believe either then or now that the testimony Cobb gave, in accordance with his statements, was anything but the truth. The reason the indictment against Cobb was nollied was that the State had no other evidence to corroborate Cobb's self-implicating statements, and that these statements alone, under West Virginia law, were insufficient for a conviction. The action was further motivated by the fact that Cobb was under a substantial prison sentence and the evidence was sufficient to justify parole revocation, which was accomplished.

■ Under the circumstances, this court cannot give credence to Cobb's repudiating statement of May 14th, as outweighing the credibility of his sworn testimony and the corroborating evidence.

It is not meet for this court to infer, from Cobb's invoking the Fifth Amendment, that his testimony here would be an admission of perjury. If inferences were to be indulged in, this court would be more inclined to infer from the circumstances of Cobb's repudiating statement, that he was intimidated by Rollins and his prison pals, and that he was seeking the easy way out to avoid testifying here, with its recriminating consequences.

No other constitutional infirmities in the trial are disclosed by the evidence. Rollins was represented by competent counsel and his trial was fair.

■■ Even assuming, *arguendo*, that Cobb's testimony was perjured, the petitioner has not carried the burden of showing that perjured testimony was knowingly used by the State. This court has not been favored with briefs or citations of authorities by either petitioner's counsel or counsel for the State, but the landmark Supreme Court cases on the subject (see Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); and Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957)) all posit knowledge of the falsity of the testimony by the prosecuting officials as an essential element. Harrison v. Boles, 307 F.2d 928 (4 Cir. 1962), makes clear that the element of knowledge on the part of prosecuting officials must be alleged in order to justify a hearing.

The only authority to the contrary which the court has been able to find is United States ex rel. Miller v. Pate, 226 F.Supp. 541 (N.D.Ill.E.D., December 31, 1963). In that case, the District Judge, evidently influenced by the fact that his petitioner was under the death sentence, ordered the petitioner conditionally released, subject to a new trial, even though the court found that no constitutional rights had been violated, simply because a material witness at the trial had repudiated her former testimony at the Federal habeas corpus hearing. The court reasoned that the subsequent in-

consistent testimony was material on the question of the credibility of the witness and was "after discovered" evidence which, in fairness, justified a new trial. It would seem that the District Court's action rubs salt in the already irritated Federal-State relationships in the administration of State criminal law by arrogating to the Federal courts jurisdiction to review State court convictions on a purely State question. It would seem better to recognize that the Federal court has no jurisdiction and advise the petitioner to use the "after discovered evidence" in seeking executive clemency, if no State judicial remedy is available.

It appearing that the petitioner is not entitled to the relief he seeks, the petition may be denied and this cause dismissed.